Chad Hummel (SBN 139055)
chummel@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
Tel: (310) 595-9505
Fax: (310) 595-9501

M. Sean Royall (*Pro Hac Vice* Forthcoming)
sroyall@sidley.com
Angela C. Zambrano (*Pro Hac Vice*
Forthcoming)
angela.zambrano@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Tel: (214) 981-3300
Fax: (214) 981-3400

Sarah A. Hemmendinger (SBN 298659)
shemmendinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-7413
Facsimile: (415) 772-7400

*Attorneys for Plaintiff
Tundra Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| TUNDRA INC.,<br><br>Plaintiff,<br><br>v.<br><br>FAIRE WHOLESALE, INC.,<br><br>Defendant. | Case No. 3:23-cv-2513<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATIONS OF SHERMAN ACT**<br><br>2. **VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**<br><br>3. **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>**JURY TRIAL DEMANDED** |

Tundra Inc. ("Tundra" or "Plaintiff") brings this action against Faire Wholesale, Inc. ("Defendant" or "Faire") and alleges as follows:

## I.    PRELIMINARY STATEMENT

1. Faire (formerly known as "Indigo Fair") dominates the market for online wholesale marketplaces that connect local independent retailers ("Retailers") throughout the United States with new or emerging domestic brands offering wholesale products ("Brands"), holding a 90% share of that market as measured by dollar sales volume.[1]  Faire acquired its monopoly market position by deploying unfair, anticompetitive, and exclusionary tactics that have thwarted competition from other actual and would-be market participants and harmed the Brands, Retailers, and consumers that Faire claims to serve – all in violation of the Sherman Act and California law, as set forth below.

2. Faire did not become the dominant online wholesale platform by offering a superior product, better pricing, or more attractive terms and conditions.  Since its inception, Faire has made money primarily by charging Brands fixed-percentage commissions for sales occurring on its platform, although Faire has raised its commission levels over time, with commissions now ranging as high as 25%, making Faire the highest-cost competitor in the market.  Other competitors have also sought to compete using commission-based models, but charging lower commission levels than Faire.  Tundra, on the other hand, developed an innovative business model that provides essentially the same service as Faire but without charging any commissions, instead relying primarily upon paid platform-based advertising to generate revenue.  Threatened by Tundra's innovative, no-commission platform, and by lower-priced commission-based competitors, Faire has implemented and exploited exclusionary agreements with Brands and Retailers to block rivals from gaining a foothold in the market.

3. Each year, Brands and Retailers sell through Faire a gross value of products approximately 5-10 times more than all of its competitors combined.  Faire as of October 2022

---

[1] *See* https://businessofhome.com/articles/faire-hits-1-billion-in-sales ("the rise of online-only B2B marketplaces" "has altered the wholesale buying process" and "Faire has become the largest online wholesale community in the world").

claimed on its website to service some 600,000 Retailers, more than ten times that of Tundra, and over 85,000 Brands.  More recently, Faire has advertised on its website that its platform encompasses "over 100,000 independent brands."  Faire has achieved this dominant position by mandating and enforcing anticompetitive restraints and using various forms of coercion and threatened penalties to enforce its monopoly and destroy competition.  Faire's anticompetitive practices, among other things, substantially raise its rivals' costs of doing business and erect meaningful barriers to competitors, impeding their ability to expand and achieve efficient scale. As a result of these practices and the broader harm they have caused to competition, Faire has been able to inflate its commissions to still-higher levels, allowing Faire to extract supracompetitive profits and to wield even greater power by using its commission structure as a coercive tool to threaten and discipline Brands and reinforce Faire's exclusionary policies and practices.

4. To sign up for Faire, Brands and Retailers must agree to the following:

a) If a Retailer purchases even a single product from a Brand on Faire, the Retailer becomes contractually prohibited from ever doing business with that Brand except on Faire.  Similarly, if a Brand sells even a single product to a Retailer on Faire, it is contractually prohibited from selling any products to that same Retailer anywhere else, online or offline.  This is an exclusive dealing requirement of indefinite duration that binds any Retailer or Brand that does business on Faire.  This requirement will be referred to herein as the "Exclusive Dealing Requirement."  If a Brand or Retailer violates the Exclusive Dealing Requirement, it can be kicked off Faire forever.  This exclusivity restriction harms Brands, Retailers, Faire's competitors, and end consumers.  It harms Brands and Retailers by blocking their ability to do business with one another through other means or on other platforms, including on Tundra's commission-free marketplace, where Brands and Retailers would otherwise be able to complete transactions at a lower cost.  Once a Brand and a Retailer transact business on even a single product on Faire, those parties are contractually barred by Faire's Exclusive Dealing Requirement from doing business together in any

2

other way for any product.  This harms Faire's competitors by substantially foreclosing their market opportunities, putting many Brands and Retailers entirely off limits to such competitors from the moment those Brands and Retailers transact a single sale on Faire.  Faire's Exclusive Dealing Requirement also harms end consumers, as it forces Retailers to purchase from many Brands only through Faire's high-commission platform, increasing what Retailers have to pay for wholesale product purchases, which in turn drives up the prices Retailers charge for those same items when sold to consumers.

b) If a Brand wants to offer even a single product on Faire, it must offer <u>every</u> product it sells on Faire, which will be referred to herein as the "Entire Catalog Requirement."  Hence, Brands that might prefer to list only some products on Faire and other products on Tundra are contractually prohibited from doing so. The Entire Catalog Requirement substantially exacerbates the harms caused by Faire's Exclusive Dealing Requirement.  The fact that Brands doing business on Faire must list all of their products on the platform has the natural and intended effect of expanding the scope Faire's mandated exclusive dealing.  The Entire Catalog Requirement, in other words, has a multiplying effect, causing the adverse market effects of Faire's restrictive policies to be exponentially greater.

5. Faire did not always have, much less enforce, these policies and practices.  As discussed below, Faire adopted these policies and practices in response to efforts by Tundra and others to build and expand their own online wholesale marketplaces.  And Faire has become increasingly aggressive in exploiting such policies and practices to limit the growth and opportunities of its rivals, a number of which have now been forced to exit the market.

6. Through imposing and enforcing the Exclusive Dealing Requirement and related policies, Faire is able to protect and expand its dominant market position while at the same time extracting supracompetitive profits by charging above-market commissions.  A firm's ability to maintain market dominance while simultaneously imposing anticompetitive conditions and

charging above-market prices is a telltale sign of monopoly power.  The antitrust laws are most concerned with monopolies that are durable, or long-lasting, placing such firms in a position to exploit their market dominance at great cost to consumers and causing lasting harm to affected markets—particularly where such monopolies are maintained through exclusionary conduct.  This is the type of dominance that Faire has achieved, and it has done so, in substantial part, through exclusionary policies and practices that have been designed and implemented with the effect of depriving Brands, Retailers, and ultimately end consumers of the benefits of fair competition, including the specific benefits of Tundra's commission-free business model.

7. Faire is also increasingly using fear and intimidation to enforce its anticompetitive policies, thereby coercing Brands and Retailers to remain trapped in a restrictive system that blocks them from competing freely themselves or enjoying the benefits of free competition.  Among other things, Faire openly and aggressively polices compliance with its policies, terms, and conditions, and treats Brands and Retailers harshly when noncompliance is detected.  For any Brand or Retailer that deviates from Faire's contractual restrictions, the consequence is often that they are forever barred from using Faire's platform.  But the consequences for Brands can be greater still.

8.    Faire charges Brands a 25% commission on first orders and a 15% commission on subsequent orders, but these commissions can be waived in some circumstances, provided that the Brand is fully compliant with Faire's then-current policies.  Yet for a Brand that Faire believes may have departed from such policies, Faire reserves the right to demand payment of previously waived commissions—in effect, imposing a substantial financial penalty for any deviation from Faire's restrictive terms and conditions.  Faire also at times withholds payment from Brands for merchandise sold on the Faire platform in response to concerns about suspected noncompliance with Faire's policies.  Faire uses the threat of such financial penalties as a coercive tool to control Brands and Retailers operating on its platform, and to discourage such companies from doing business with Faire's competitors.

9. As a result of Faire's anticompetitive and often punitive actions, Brands and Retailers feel compelled to remain on Faire even though they increasingly resent Faire's restrictive policies and would prefer to take some or all of their business elsewhere, including to Tundra.  And

competitors like Tundra are thus foreclosed from fairly competing for the business of such customers, because once a Brand or Retailer has become locked in to Faire's platform and related policies it becomes extremely costly for such customers to move even a portion of their business to Tundra's marketplace.  Even though Tundra's innovative marketplace is entirely commission-free, Faire's punitive policies, terms, and conditions make switching to Tundra prohibitively costly.

10. These practices violate the Sherman Act, which prohibits monopolization, attempted monopolization, and unreasonable restraints on trade, as well as California's Unfair Competition Law (Business and Professions Code Section 17200) (the "UCL").  In addition, Faire has tortiously interfered with Tundra's contractual relationships with its customers.  This suit seeks to halt Faire's anticompetitive, unfair, and illegal practices, obtain redress for the severe damage caused to Tundra, and restore fair competition in the market for online wholesale product marketplaces.

## II.       THE PARTIES

11. Tundra is a Delaware corporation with its principal place of business at 345 Heritage Ave, #1600, Portsmouth, NH, 03801.

12. Faire is a Delaware corporation with its principal place of business at 100 Potrero Ave., San Francisco, CA 94103.  Summons may be served by and through its registered agent, Kunal Bajaj at 100 Potrero Ave., San Francisco, CA 94103.

## III.      JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 15 U.S.C. § 4, 28 U.S.C. § 1331, and 28 U.S.C. § 1337(a).  The Court has subject matter jurisdiction over the UCL and tortious interference claims arising under state law pursuant to 28 U.S.C. § 1367(a), because Tundra's state law claims arise out of the same nucleus of operative facts as its federal law claims.

14. This Court has personal jurisdiction over Faire because, upon information and belief, Faire is a resident of this judicial district ("District"), has systematic and continuous contacts in this District, regularly transacts business within this District, and regularly avails itself of the

benefits of this District.  Upon information and belief, Faire derives substantial revenues from sales in this District.

15. Venue is proper in this District under 28 U.S.C. § 1391(b) in that Faire is subject to personal jurisdiction in this District.  First, Defendant Faire resides in this District, making venue proper under 28 U.S.C. § 1391(b)(1).  Further, a substantial part of the events giving rise to the claim occurred in this District (which contains Faire's corporate headquarters), making venue proper under 28 U.S.C. § 1391(b)(2).

## IV.   DIVISIONAL ASSIGNMENT

16. Divisional Assignment to the San Francisco Division is proper pursuant to Civil Local Rule 3-2(c) and (d) because a substantial portion of the events giving rise to this action occurred in San Francisco County, where Defendant Faire maintains its principal place of business.

## V.   FAIRE'S EXCLUSIONARY CONDUCT AND RELATED MARKET IMPACTS

### a.   The Online Market To Match Brands With Retailers

17. Over the past two decades, consumer-facing online retailers such as Amazon have delivered increased convenience, better price transparency, and a host of other benefits to consumers.  While direct-to-consumer online models have been extremely successful, Americans still buy an enormous share of their products in physical stores, commonly known as "physical retail," a channel that is vital for small retailers.  Less well known, but critically important to the success of these small businesses, is the market for online wholesale marketplaces, where products can be purchased in bulk, including from smaller Brands.  Smaller Retailers use such online marketplaces to identify Brands with attractive products, and conveniently make bulk product orders from such Brands at preferential "wholesale" prices.[2]  The Retailer then sells such products to end consumers at the Retailer's physical location, earning profits from the margin between the

---

[2] The largest retail companies have their own supply chains, where wholesale prices are negotiated with each supplier as part of ordering potentially millions of items for thousands of stores.  This dispute is not about those supply chains, and that market is entirely separate from the one involved in this suit, as neither Faire nor Tundra operates in this market nor seeks to do so.

PLAINTIFF'S ORIGINAL COMPLAINT
CASE NO. 3:23-CV-2513

wholesale prices paid to procure the items and the higher retail prices the Retailer is able to charge to its customers.[3]

18. Despite the success of large, "big box" retailers such as Target and Walmart, there are hundreds of thousands of independent retail stores that have only one or a few retail locations. These Retailers typically sell a relatively small selection of high-quality, hand-picked goods such as specialty foods, candles and soaps, and home decorations and furnishings. Such Retailers make up an important part of the nation's broader retail sales sector in both percentage and absolute terms.

19. Small, independent makers of products sold through the independent retail channel—again, referred to herein as "Brands"—are essential to the viability of Retailers because they provide a significant share of the products that Retailers sell at their stores. These Brands are typically small, individually owned companies that create and sell their own high-quality products. While some Brands market their products directly to consumers on a site like Etsy, this is often not practical for several reasons, including lack of brand visibility, a lack of scale, difficulty with logistics for individual sales, and a lack of convenience. As such, many Brands instead market directly to Retailers at wholesale. The ability of Retailers and Brands to find each other and make good "matches" is absolutely essential for the survival of both: the better the Brand's products can be "matched" with Retailers who want to sell them, the more likely it is that each can remain financially viable in the face of stiff competition from larger, more established brands and larger retail chains.

20. For decades, traditional in-person trade shows were the most common forum for Brands and Retailers to identify each other and establish a wholesale relationship. Traditional trade shows, however, require a significant investment of time and resources, for both buyers and sellers. There are only a few such trade shows each year, and representatives must travel to the

---

[3] Direct internet retailers such as Amazon do not have the same business model as Faire or Tundra and are not in competition with them. Amazon typically sells single product units directly to consumers, and neither Faire nor Tundra even allow consumers to purchase individual products. Amazon, as a direct-to-consumer retailer, clearly is not in the business of supplying bulk items to other retailers at wholesale prices.

trade show, set up a booth, and spend several days and thousands of dollars to reach a relatively small number of potential customers.  Through online wholesale channels, Brands and Retailers can now interact and do business with each other far more efficiently.  Not only are the costs of doing wholesale business online far lower compared to traditional trade shows, but online wholesale marketplaces also enable Brands and Retailers to reach a far broader audience and scope of potential business partners, as compared to traditional trade shows.

21. Given the vastly different and more efficient opportunities and benefits that online wholesale marketplaces provide, such platforms have emerged as a completely distinct market. The COVID-19 pandemic further advanced the development of this distinct market by magnifying both the need for and benefits of both identifying wholesale business partners and completing related transactions online.  Travel restrictions during COVID all but eliminated physical trade shows for a period of years, but even in the aftermath of such travel restrictions trade shows are no longer regarded by most Brands and Retailers as an efficient or convenient means to connect and transact business, and attendance at trade shows has continued to wane.  Although some Brands and Retailers continue to participate in traditional in-person trade shows, in most cases this is in addition to such Brands and Retailers using one or more online wholesale marketplaces. Trade shows are not, and never have been, a viable substitute for online wholesale marketplaces, nor are there any other viable substitutes for online wholesale marketplaces.

### b.    *Faire Enters in 2017 But Soon Faces Competitive Threats*

22. The first online wholesale marketplace to connect Brands and Retailers was created and launched in 2014 by Etsy, and known as "Etsy Wholesale."  However, by mid-2018 Etsy Wholesale had been shut down, an early sign of the difficulties of successfully entering this area of e-commerce.  Faire was founded in 2017 and was able to take advantage of Etsy Wholesale's shutdown the following year.

23. From the outset, Faire had a commission-based business model.  Initially, Faire charged Brands 15% commissions for orders completed on Faire's marketplace, although it quickly

1    increased this to an 18% commission later in 2017.  And by 2018 Faire raised its commissions to

2    25% for first-time orders.[4]

3    24. Several other competitors entered the market following Faire and sought to compete

4    by providing comparable online services designed to match Brands and Retailers.  Tundra was

5    among the first companies to launch an alternative to Faire's marketplace, although Tundra set

6    itself apart by eschewing a commission-based model in favor of a more innovative, easy to use,

7    entirely commission-free platform.  Instead of charging commissions, Tundra generates revenue

8    primarily through platform-based advertising.  Tundra's differentiated commission-free business

9    model presented a particularly significant threat to Faire's business.  However, other competitors

10   entered the market as well, and sought to compete in part by undercutting Faire's commissions.

11   Whereas Faire by 2018 was charging, at the highest level, 25% commissions, other competitors

12   charged commissions between 10% and 15%, and some below 10%.

13   25. Given the fortuitous timing of Faire's entry, it was able to claim a leading market

14   position in the wake of Etsy Wholesale's withdrawal.  But as Tundra and other competitors

15   entered, offering more attractive business models and comparable or better online platforms and

16   services, Faire's early lead in this developing market was seriously threatened.  And Faire

17   responded by implementing new policies and practices designed to minimize and block such

18   competition.

19          *c.*     ***Faire Employs Anticompetitive Restrictions To Capture Retailers,***

20                  ***Exploit Brands, and Exclude Rivals***

21   26. To protect its market dominance, Faire has implemented and enforced a variety of

22   exclusionary policies and practices, which in combination have done severe harm to competition

23   and allowed Faire to strengthen its monopoly control over the market.

24   27. **Exclusive Dealing Requirement.**  In response to growing competition from Tundra

25   and other online wholesale marketplaces, Faire implemented an exclusive dealing provision, which

26   has been reflected in its Terms of Service for Brands and Retailers since at least early 2019.  Under

27

28   ─────────────

[4] Faire very recently announced that it is raising certain commission levels yet again, effective July 5, 2023.

this provision, which Faire refers to as its "No Circumvention" policy, once a Brand completes any order with a Retailer on Faire's marketplace, the Brand is contractually prohibited from doing business with the Retailer "in any manner" other than on Faire—meaning that the Brand cannot transact with the same Retailer on any other competing online wholesale marketplace, and likewise cannot do business with the Retailer offline.  This restriction is accompanied by an explicit threat that violation of this condition may cause the "deactivat[ion] or terminat[ion]" of the offending accounts at any time.[5]  This Exclusive Dealing Requirement, which has no legitimate business justification, was implemented with the purpose and effect of substantially foreclosing competition from Faire's rivals, and is a key means by which Faire has secured and maintained monopoly power.

28. As an example, suppose that Brand A sells home décor items on Faire as well as on Tundra, and Retailer B is also on both platforms.  If Brand A and Retailer B do a single transaction on Faire, they are contractually prohibited from doing any business with each other on Tundra or other competing online wholesale marketplaces for all time.  Furthermore, they are prohibited from ever doing business together "in any manner" offline.  The Exclusive Dealing Requirement thus has the effect of "removing" these Brand-Retailer pairings from all commercial channels except for Faire, forever.

29. Given Faire's overwhelmingly dominant market position, accounting for approximately 90% of all sales completed on domestic online wholesale marketplaces, this Exclusive Dealing Requirement has the effect of foreclosing Faire's rivals from the vast majority of Brand-Retailer pairings and related sales transactions occurring online across the United States.  And Faire's dominant market position continues to strengthen and expand, at the cost of its competitors.  Indeed, two competitors—Trada and Abound—were forced to exit the market this year, and two other competitors—Hubba and Boutsy—exited in 2021-22.  Thus, Faire's monopoly grip on the market is only growing stronger, and through the Exclusive Dealing Requirement Faire

[5] Faire Terms of Service for Brands and Conditions at Section 11(e).

has contractually ensured that competitors that might otherwise lure business away from Faire's marketplace are shut out from such business opportunities.

30. Well over 70% of the wholesale business done on Faire is done by pairings of Brands and Retailers that have previously transacted on Faire and are thus bound by Faire's Exclusive Dealing Requirement. Given that Faire has a stable market share in excess of 90%, and that more than 70% of Faire's business is subject to exclusivity restrictions, through the Exclusive Dealing Requirement Faire has plainly foreclosed a substantial portion of the market to competition.

31. Faire's Exclusive Dealing Requirement has been extremely effective in insulating the company against competition, owing in part to how actively and aggressively Faire enforces this policy. Faire's Terms of Service for Brands state that the company "reserves the right to deactivate or terminate" any Brand that "fails to abide by" the Exclusive Dealing Requirement. And Faire devotes significant resources to policing compliance with this provision. For any Brand operating on Faire, the risk of being terminated and banned from Faire's marketplace is a serious threat. If a Brand is removed from Faire, it potentially loses access to 90% or more of the business done on online wholesale marketplaces, which could be financially ruinous for any Brand. Faire enforces this and other requirements through electronic surveillance across the internet, also known as "data scraping." Faire has repeatedly and permanently excluded both Brands and Retailers from the Faire platform for violating the company's Terms of Service for Brands or Retailers, and this type of aggressive surveillance and punitive enforcement has been highly effective in deterring Brands from deviating from Faire's strict expectation of exclusivity.

32. **Entire Catalog Requirement**. As of 2019, Faire requires that if a Brand is to list a single product on Faire, it must list every single product it sells (online or offline) on Faire. In other words, a Brand cannot sell 10 out of the 25 products it makes on Faire and the other 15 on Tundra. If it did so, the Brand would risk being kicked off Faire completely. Similarly, a Brand cannot list any product on Tundra that it does not also list on Faire. This all-or-nothing requirement expands the scope of the business Brands are required to do on Faire, which in turn expands the scope and effect of Faire's Exclusive Dealing Requirement. In addition, the Entire Catalog Requirement greatly impedes the ability of rival online wholesale marketplaces to attract the

11

business of Brands that are already on Faire, because it limits those Brands' ability to choose where and how to market their products.

33. **Commissions As Enforcement**.  Finally, Faire uses its listed commissions on Brands as another enforcement mechanism.  Faire's Terms of Service for Brands "waive" a 25% commission for certain transactions using Faire provided that the Brand complies with the Faire Terms Service for Brands in full.  The potential reinstatement of "waived" commissions is a powerful and coercive tool that Faire uses to compel compliance with its restrictive Terms of Service for Brands.  Any Brand found to have deviated from Faire's policies not only would be at risk of being permanently banned from Faire, but would also potentially be forced to pay previously "waived" commissions as a penalty.

34. **Withholding of Payments as Enforcement.**  In addition, Faire at times has responded to suspected noncompliance by refusing to make payment to Brands for the proceeds of wholesale transactions already completed on the Faire platform.

* * *

35. These policies and practices, taken together and combined with Faire's extremely high market share, have severely restricted competition from rival online wholesale marketplaces, allowing Faire to acquire and maintain monopoly power.  And Faire has exercised and exploited its monopoly power through increasing the level of commissions it charges to levels that exceed all other competitors, and through coercing Brands and Retailers to comply with highly restrictive conditions that unnecessarily and unreasonably limit their ability to freely do business, including their ability to benefit from alternative online wholesale platforms like Tundra, where Brands pay no commissions.  The consequence of these practices is that Faire's market dominance has continued to increase; many Brands and Retailers have become locked in to using Faire and blocked from doing business with Faire's rivals; Faire's competitors have been severely harmed, and some have been forced to withdraw from the market altogether; and these restraints have led to an overall reduction of competition that has, among other things, led to higher overall costs for Brands and Retailers and higher wholesale and retail prices.

d.   *Faire Engages In Other Unfair And Tortious Acts*

36. Faire also uses a variety of other unfair practices to make it difficult for rivals to compete, and that constitute tortious interference with contract.

37. **Faire Targets Tundra Brands To Further Increase Its Market Share**. Tundra has also been told by Brands that Faire has targeted them "in regards to their Tundra account" and caused them to cease doing business on Tundra. Specifically, on February 23, 2021, Tundra received an email from a Brand doing business both on Faire and Tundra indicating that Faire was pressuring them to leave Tundra and do business only on Faire. The Brand wrote to a Tundra customer support representative:

> Thank you so much for reaching out! I really appreciate your concern and your help.
>
> To be completely honest, Faire reached out to me because there were "complaints" about my products being on Tundra at a lower cost. I explained to them this was Tundra's model and that Tundra doesn't take a commission, suppliers offer products at a lower cost. I'm sure they're well aware, but I had to explain so they realized how they were limiting my business's reach if I can only be on Faire.
>
> Faire is big now and with that comes more rules. I'm in violation of their vendor policy. I'm talking to them about it because that's really limiting my reach as a small business. Do you know if this is truly a problem? Have other vendors suddenly had a problem with this? I've had Faire for several years, and Tundra for at least a year now. I'm curious how this is just now becoming a problem. I can't be the only one.

38. This correspondence shows that Faire contacts customers Tundra has valid and existing contracts with and induces them to change their pricing on Tundra, or to leave Tundra's platform altogether. Despite the Brand's concern that it was "limiting my business's reach if I could only be on Faire," in response to Faire's pressure tactics this Brand has since left Tundra and now only markets its products on Faire. On information and belief, this pattern of targeted attacks on companies doing business on Tundra is widespread. As the same Brand stated, "I'm sure I'm not the only brand they're coming after in regards to their Tundra account. Really disappointing."

39. **Faire Attacks Tundra's New WSC Platform**. Tundra in 2022 launched a new platform, Wholesale Co-op ("WSC"), which allowed retailers to earn cash back on their orders on wholesale marketplaces, including Faire. Faire responded with a concerted effort to dismantle this new offering. It threatened businesses that signed up for WSC or were considering joining,

13

employed highly skilled engineers to thwart WSC's platform and disrupt the business, used electronic subterfuge to attempt to greatly increase costs for WSC of operating its service, and threatened crippling legal action if the names of all participating Retailers weren't immediately disclosed.

40. Faire recently told a brand that had just signed up for WSC that participating on WSC would amount to a breach of Faire's policies and result in the Brand's removal from Faire. The Brand in question, fearing the damage to its business that would result from being expelled from Faire, informed WSC that it would have to withdraw from their services due to Faire's demands.

## VI.   INTERSTATE COMMERCE

41. Faire is engaged in, and its activities substantially affect, interstate trade and commerce. Faire has sold over 125 million products in the last year, with an average of over $10 million in sales per day during peak buying periods.

## VII.   RELEVANT PRODUCT MARKET

42. The relevant product market in this action is the market for online wholesale marketplaces that connect local retailers throughout the United States with new or emerging domestic brands. Faire and Tundra both compete in this market. This market is separate and distinct from other wholesale channels, including traditional trade shows. Online wholesale marketplaces enable Brands and Retailers to identify each other, create "matches," and commence with processing wholesale product orders in ways that are far more efficient than any other method of doing such business. As explained above, attending traditional trade shows is costly and inconvenient, and in recent years attendance at trade shows has dwindled. Brands and Retailers alike have come to appreciate that online wholesale marketplaces provide a far superior platform for advancing their businesses. Among other benefits, a Brand or Retailer can use a platform like Faire or Tundra as a one-stop repository for wholesale licenses and payment, whereas with other approaches for conducting wholesale business, including traditional trade shows, each transaction between a Brand and a Retailer may be accompanied by significant paperwork and other inconveniences.

43. Some Brands do seek to market directly to consumers using services like Etsy, but that is an entirely different business channel and in no way a substitute for online wholesale marketplaces that connect Brands and Retailers and facilitate the efficient creation and perpetuation of wholesale Brand-Retailer relationships.  Similarly, some Brands and Retailers are able to identify each other through online searches or word of mouth, and may develop direct wholesale relationships outside of online wholesale marketplaces.  This again is no substitute for the broader benefits that are uniquely available to Brands and Retailers though participation in online wholesale marketplaces, which create exposure to many thousands of potential wholesale business partners, and enable Brands and Retailers opportunities to efficiently grow their businesses in ways that cannot be achieved through any alternative means, online or offline.

44. There are no reasonable or economically viable substitutes for the services provided to Brands and Retailers through online wholesale marketplaces.

45. Given the lack of viable alternatives, a hypothetical monopolist in the market for online wholesale marketplaces could profitably impose a small but significant non-transitory increase in price.

## VIII.   RELEVANT GEOGRAPHIC MARKET

46. For the purposes of this lawsuit, the United States of America is the relevant geographic market.  There are multiple online wholesale marketplaces operating within the US, including Faire and Tundra.  US-based Brands and Retailers typically use online wholesaler marketplaces that are focused upon serving US-based businesses.  For such US-based Brands and Retailers, the only reasonable substitute for an online wholesale marketplace such as Faire or Tundra would be another online wholesale marketplace operating within the US and serving US-based Brands and Retailers.

## IX.     MARKET AND MONOPOLY POWER

47. In addition to Faire and Tundra, online wholesale marketplace services for US-based Brands and Retailers are offered by Boston-based Mable and New York-based Bulletin, among others.  But Faire is by far the dominant firm in this market.  Across Retailers, Faire as of 2023 accounts for 90% or more of all business conducted on US-based online wholesale marketplaces,

15

as measured by the dollar value of purchases.  As such, Faire has at least a 90% market share, which is an accurate reflector of the degree of Faire's market dominance.

48. Faire's market dominance is protected and reinforced by high barriers to entry and expansion.  Indeed, Faire's anticompetitive practices by design and in practice substantially raise its rivals' costs and erect significant obstacles to the ability of such firms to fairly compete and expand, with the effect that Faire is able to hold its competitors, including Tundra, at bay, preventing those competitors from achieving efficient scale.  Faire, on the other hand, uses the same anticompetitive practices to maintain and grow the scale of its business and increase the degree of its control over both Brands and Retailers.

49. Faire's market dominance is reinforced in part through networks effects, which it consciously exploits to its advantage.  As explained above, many Brands and Retailers have become locked in to using Faire's online wholesale marketplace and their businesses would suffer significant harm if they were removed from Faire's platform.  Faire has used its size advantages, together with restrictive policies and practices discussed above, to gain further control over Brands and Retailers and to compel such firms to agree to Faire's above-market commissions and other anticompetitive Terms of Service for Brands and Retailers and related practices.  There are many Brands and Retailers doing business on Faire's platform that would like to do business with Tundra or other rivals, or to expand the scope of their relationships with such rivals, but that cannot justify doing or expanding business with Faire's competitors for fear of the adverse economic consequences that could result from Faire's anticompetitive policies and practices.  As a result, even for a competitor like Tundra that charges no commissions, doing business with Tundra is costly for many Brands and Retailers, if not cost-prohibitive.

50. In light of the aforementioned barriers, it is highly unlikely that any meaningful new entry or expansion into the market for the online wholesale marketplaces will occur on a timely or sufficient basis to limit or restrain Faire's substantial market and monopoly power.

51. As Faire has secured increased economic power and control over the relevant market, it has exercised such power by charging consistently higher commissions and by coercing Brands and Retailers to acquiesce to Faire's various anticompetitive restrictions.  As Brand owner Chelsea

16

Ward stated in 2019, "I love the opportunity Faire offers small makers, but I feel like Faire is also run by opportunists hoping to gouge the maker community.  Where we have no option but to be on Faire and pay whatever fee they charge just to stay competitive."

52. Notwithstanding such negative customer sentiments, Brands and Retailers continue to list their products on Faire, subjecting themselves to Faire's above-market commissions and anticompetitive policies and practices.  Brands and Retailers feel compelled to do business with Faire because, as noted, they realistically have "no option."

## X.      CAUSAL ANTITRUST INJURY

53. The anticompetitive conduct by Faire described herein has caused substantial and ongoing harms to Tundra's business, which constitute cognizable antitrust injuries.

54. As explained above, Faire has adopted various anticompetitive policies and practices with the purpose and effect of restricting competition from rival online wholesale marketplaces, including Tundra.   Faire's exclusionary conduct has severely restricted Tundra's business opportunities and foreclosed Tundra from a substantial portion of the relevant market, including by blocking Tundra's ability to do business with most Retailers and Brands that, by participating in Faire's market-dominant platform, have become subject to Faire's anticompetitive Terms of Service for Brands and Retailers and related practices.

55. Through its challenged policies and practices, Faire has harmed Brands, Retailers, end consumers, and the competitive process as a whole.  As intended, Faire has specifically used anticompetitive terms and conditions in agreements with Brands and Retailers to thwart competition from Faire's rivals.  This conduct and the broader array of practices described above give rise to multiple violations of the federal antitrust laws, and Tundra's injuries flow from the same competition-reducing aspects of Faire's conduct that give rise to such violations.

56. But for Faire's anticompetitive conduct, Tundra's innovative, commission-free platform would have succeeded in generating substantially more business from Brands and Retailers, and the total harm done to Tundra's business as a result of such practices will be reasonably ascertainable through proof to be submitted at trial.

**FIRST CAUSE OF ACTION**

**(Monopolization Under 15 U.S.C. § 2)**

57. Tundra incorporates the preceding paragraphs as though fully set forth herein.

58. The market for online wholesale marketplaces connecting Brands and Retailers in the United States is a well-defined relevant antitrust market.

59. Faire has monopoly power in this market, as evidenced by its dominant market share and various other indicia of monopoly power described herein.

60. Faire has used a variety of forms of exclusionary conduct, including unlawful exclusive dealing agreements reinforced through other punitive and coercive practices, to limit and exclude competition from Tundra and other rivals, allowing Faire to illegally acquire and maintain its monopoly market position.  There is no legitimate business justification for such conduct.  This course of conduct constitutes monopolization in violation of Section 2 of the Sherman Act.

61. Faire's exclusionary conduct has caused substantial harm to competition and specific, cognizable antitrust injuries to Tundra.

62. Faire's conduct has occurred in and affected interstate commerce.

**SECOND CAUSE OF ACTION**

**(Attempted Monopolization Under 15 U.S.C. § 2)**

63. Tundra incorporates the preceding paragraphs as though fully set forth herein.

64. The market for online wholesale marketplaces connecting Brands and Retailers in the United States is a well-defined relevant antitrust market.

65. Faire has substantial market power in this market, as evidenced by its dominant market share and various other indicia of monopoly power described herein.

66. Faire has used a variety of forms of exclusionary conduct, including unlawful exclusive dealing agreements reinforced through other punitive and coercive practices, to limit and exclude competition from Tundra and other rivals.  Faire has engaged in such practices with the specific intent to exclude competition and obtain an unlawful monopoly, and through such conduct Faire has a dangerous probability of succeeding in monopolizing the relevant market.  There is no

legitimate business justification for this conduct.  This course of conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act.

67. Faire's exclusionary conduct has caused substantial harm to competition and specific, cognizable antitrust injuries to Tundra.

68. Faire's conduct has occurred in and affected interstate commerce.

## THIRD CAUSE OF ACTION

### (Unreasonable Restraint of Trade Under 15 U.S.C. § 1)

69. Tundra incorporates the preceding paragraphs as though fully set forth herein.

70. The market for online wholesale marketplaces connecting Brands and Retailers in the United States is a well-defined relevant antitrust market.

71. Faire has substantial market power in this market, as evidenced by its dominant market share and various other indicia of monopoly power described herein.

72. Faire's aforementioned agreements with Brands and Retailers constitute concerted action and unreasonable restraints of trade.

73. There is no legitimate business justification for the challenged provisions, terms, and conditions in Faire's agreements with Brands and Retailers, and Faire has enforced such provisions, terms, and conditions with the intent and effect of unreasonably restraining competition in the relevant market.

74. Faire's anticompetitive and restrictive agreements with Brands and Retailer, as written and enforced, constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act.

75. Faire's unlawful restraints of trade have caused substantial harm to competition and specific, cognizable antitrust injuries to Tundra.

76. Faire's conduct has occurred in and affected interstate commerce.

## FOURTH CAUSE OF ACTION

### (Unfair Competition Under Cal. Bus. & Prof. Code § 17200)

77. Tundra incorporates the preceding paragraphs as though fully set forth herein.

78. The market for online wholesale marketplaces connecting Brands and Retailers in the United States is a well-defined relevant market.

79. Faire has substantial market or monopoly power in this market, as evidenced by its dominant market share and various other indicia of monopoly power described herein.

80. Faire has used a variety of forms of exclusionary conduct, including unlawful exclusive dealing agreements reinforced through other punitive and coercive practices, to limit and exclude competition from Tundra and other rivals.  Faire has engaged in such practices with the specific intent to exclude competition and obtain an unlawful monopoly, and through such conduct Faire has acquired and maintained monopoly power, or at a minimum a dangerous probability of succeeding in monopolizing the relevant market.  There is no legitimate business justification for this conduct.

81. This course of conduct, among other things, violates Cal. Bus. & Prof. Code § 17200.

82. Faire's conduct is unfair because it threatens an incipient violation of antitrust law, or violates the policy or spirit of the antitrust laws because its effects are comparable to or the same as a violation of antitrust law, or otherwise significantly threatens or harms competition.

83. Faire's unfair acts and practices have caused substantial harm to competition and specific, cognizable injuries to Tundra.

## FIFTH CAUSE OF ACTION

### (Tortious Interference with Contractual Relations)

84. Tundra incorporates the preceding paragraphs as though fully set forth herein.

85. Faire has committed intentional interference with Tundra's contractual relationships with one or more Brands.

86. Faire knows that contracts exist between Tundra and such third-party Brands.

87. Faire's unlawful actions detailed herein intentionally prevents or hinders performance of those Tundra-Brand contracts.  On at least one occasion, it contacted a Brand and pressured that Brand to cease doing business with Tundra and/or risk being in violation of Faire's vendor policy.

88. Through taking such action, Faire intends to interfere with Brands' contractual relationships with Tundra, and on that occasion, in fact did so—the Brand eventually left the

20

Tundra platform and, despite efforts to regain the business, the Brand currently markets on the Faire platform and not Tundra.

89. There is no legitimate business justification for this conduct.

90. Faire substantially caused financial harm to Tundra through its above conduct.

## JURY DEMAND

91. Tundra demands a jury trial on all counts triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Tundra respectfully requests judgment from this Court as follows:

A.  The entry of judgment against Faire for violations §§ 1 and 2 of the Sherman Act, as well as California Business and Professions Code § 17200, and California law;

B.  The imposition of injunctive relief against Faire and its officers, employees, agents, attorneys, affiliates, successors, assigns, and others acting in privity or concert with them, and their parents, subsidiaries, divisions, successors and assigns, prohibiting Faire from committing further violations of §§ 1 and 2 of the Sherman Act, California Business and Professions Code § 17200, and California law, and specifically requiring that Faire discontinue the anticompetitive and unfair acts and practices that give rise to Tundra's claims herein.

C.  An award of compensatory damages to Tundra in an amount adequate to fully compensate for the injuries to Tundra's business caused by Faire's unlawful behavior;

D.  Treble damages, costs, and attorneys' fees;

E.  Restitution; and

F.  Such other legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

Dated:  May 23, 2023          _/s/ Chad Hummel_____

Chad Hummel (SBN 139055)
chummel@sidley.com

SIDLEY AUSTIN LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
Tel: (310) 595-9505
Fax: (310) 595-9501

M. Sean Royall (*Pro Hac Vice* Forthcoming)
sroyall@sidley.com
Angela C. Zambrano (*Pro Hac Vice* Forthcoming)
angela.zambrano@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Tel: (214) 981-3300
Fax: (214) 981-3400


Sarah A. Hemmendinger (SBN 298659)
shemmendinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-7413
Facsimile: (415) 772-7400

*Attorneys for Plaintiff*
*Tundra Inc.*