1  KATHERINE B. FORREST (*admitted pro hac vice*)
   kforrest@paulweiss.com
2  MATTHEW A. ROBINSON (*admitted pro hac vice*)
   mrobinson@paulweiss.com
3  EKATERINA STYNES (*admitted pro hac vice*)
   kstynes@paulweiss.com
4  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
5  1285 Avenue of the Americas
   New York, NY  10019-6064
6  Telephone: (212) 373-3000
   Facsimile: (212) 757-3990
7

8

                    **UNITED STATES DISTRICT COURT**
9
                  **NORTHERN DISTRICT OF CALIFORNIA**
10
                     **SAN FRANCISCO DIVISION**
11
   TUNDRA INC.,                          Case No. 3:23-cv-2513
12
                   Plaintiff,            **DEFENDANT FAIRE**
13                                       **WHOLESALE, INC.'S MOTION TO**
                                         **DISMISS PLAINTIFF TUNDRA**
14                 - v. -                **INC.'S**
                                         **AMENDED COMPLAINT FOR**
15 FAIRE WHOLESALE, INC.,                **(1) VIOLATIONS OF THE**
                                         **SHERMAN ACT,**
16                 Defendant.            **(2) VIOLATIONS OF**
                                         **CALIFORNIA'S UNFAIR**
17                                       **COMPETITION LAW, AND**
                                         **(3) TORTIOUS INTERFERENCE**
18                                       **WITH CONTRACTUAL**
                                         **RELATIONS**
19
20                                       Date: Thursday, August 1, 2024
                                         Time: 2:00 p.m.
21                                       Judge: Araceli Martínez-Olguín
                                         Courtroom: 10
22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2       TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3       PLEASE TAKE NOTICE that on August 1, 2024 at 2 p.m., or as soon thereafter

4  as the matter can be heard, before the Honorable Araceli Martinez-Olguin in Courtroom No. 10

5  on the 19th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450

6  Golden Gate Avenue, San Francisco, CA 94102, Defendant Faire Wholesale, Inc. will, and

7  hereby does, move this Court for an order dismissing in its entirety the Amended Complaint, and

8  all causes of action it contains under Fed. R. Civ. P. 12(b)(6) for failure to plead facts sufficient

9  to state a claim upon which relief may be granted.

10      This motion is based on this Notice, the attached Memorandum of Points and

11  Authorities, the concurrently filed Proposed Order, the pleadings, any papers filed herewith, the

12  entire file in this action, any Reply that may be filed in support of the motion, and any other

13  arguments or evidence that may be presented to the Court at or before the time of the hearing.

14

15  Dated: June 14, 2024

16

17                      **PAUL, WEISS, RIFKIND, WHARTON &**
                        **GARRISON LLP**
18

19

20                      By: /s/ *Katherine B. Forrest*
21                           Katherine B. Forrest

22                      *Counsel for Defendant*
23                      Faire Wholesale, Inc.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

ISSUES TO BE DECIDED ....................................................................................1

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ....................................................................................3

LEGAL STANDARD............................................................................................4

ARGUMENT .........................................................................................................5

I.   TUNDRA HAS AGAIN FAILED TO ALLEGE A PLAUSIBLE
     RELEVANT PRODUCT MARKET, WITHOUT WHICH ALL OF ITS
     ANTITRUST CLAIMS FAIL ......................................................................5

II.  TUNDRA FAILS TO ALLEGE FACTS EVIDENCING AN
     ANTICOMPETITIVE TERM IN FAIRE'S TERMS OF SERVICE.................8

     A.   Tundra's Exclusive Dealing Claims Require Proof of Substantial
          Foreclosure of the Relevant Market........................................................8

     B.   Faire's "No Circumvention" Policy Is Part of a Contract That Is
          Easily Terminable at Will on Short Notice, and Therefore Does
          Not Foreclose Competition as a Matter of Law....................................10

     C.   Tundra's Challenge to Faire's "Entire Catalog" Policy Adds
          Nothing to Its Inadequate Exclusive Dealing Allegations....................15

     D.   Tundra's Remaining Allegations of Anticompetitive Conduct Are
          Ill-Pled and Insufficient to Save Tundra's Antitrust Claims .................17

III. TUNDRA'S TORTIOUS INTERFERENCE CLAIM DEPENDS ON THE
     ILLEGALITY OF FAIRE'S CUSTOMER CONTRACTS, AND
     SHOULD BE DISMISSED FOR THE SAME REASON AS THE
     ANTITRUST CLAIMS ..............................................................................19

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec In'tl, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ...............................................................16

*Ahn v. Stewart Title Guaranty Co.*,
  93 Cal. App. 5th 168 (Cal. 4th Dist. Ct. App. 2023) ...............................20

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, Inc.*,
  592 F.3d 991 (9th Cir. 2010) ........................................................2, 12, 18

*Applied Med. Res. Corp. v. Medtronic, Inc.*,
  No. 8:23-cv-00268-WLH-DFM, 2023 WL 5503107 (C.D. Cal. Aug. 2, 2023)...............14, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................4

*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994)................................................................13, 16

*U.S. v. Bear*,
  439 F.3d 565 (9th Cir. 2006) ...................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................4

*Cascade Health Solutions v. Peacehealth*,
  515 F.3d 883 (9th Cir. 2008) ...................................................................17

*Church & Dwight Co. v. Mayer Labs., Inc.*,
  868 F. Supp. 2d 876 (N.D. Cal. 2012) .....................................................12

*Coalition for ICANN Transparency v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) .....................................................................7

*Coronavirus Reporter v. Apple, Inc.*,
  85 F.4th 948 (9th Cir. 2023) ......................................................................8

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ...................................................................2

*Eisai Inc. v. Sanofi-Aventis U.S.*,
  2014 WL 1343254 (D.N.J. March 28, 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016) ......................................................................................................17

*In re EpiPen Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) .............................................................12, 13

*In re Gilead Scis. Secs. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ........................................................................................4

*Hicks v. PGA Tour*,
   Inc., 897 F.3d 1109, 1120 (9th Cir. 2018) .....................................................................5

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal.5th 1130 (2020) ...................................................................................................19

*Kaplan v. Burroughs Corp.*,
   611 F.2d 286 (9th Cir.1979) ...........................................................................................8

*KST Data, Inc. v. DCX Tech.*,
   2018 WL 5733515 (C.D. Cal. April 30, 2018) ............................................................11

*Lazy Y. Ranch Ltd. v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ..............................................................................2, 11, 17

*Maxim Integrated Prods., Inc. v. Analog Devices, Inc.*,
   1996 WL 117425 ...........................................................................................................12

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008) ........................................................................................4

*MLW Media LLC v. World Wrestling Entertainment, Inc.*,
   655 F. Supp. 3d 946 (N.D. Cal. 2023) ...........................................................................8

*In re Mylan N.V. Secs. Litig.*,
   666 F.Supp.3d 266 (S.D.N.Y. March 30, 2023) ..........................................................12

*Obserstein v. Live Nation Ent., Inc.*,
   60 F.4th 505 (9th Cir. 2023) .........................................................................................11

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ............................................................................. *passim*

*PNY Tech., Inc. v. SanDisk Corp.*,
   2014 WL 2987322 (N.D. Cal. 2014) ............................................................................14

*Power Analytics Corp. v. Operation Tech., Inc.*,
   2018 WL 10231437 (C.D. Cal. July 24, 2018) .......................................................14, 16

*Primetime 24 Joint Venture v. National Broadcasting Co.*,
   219 F.3d 92 (2d Cir. 2000) ...........................................................................................19

*Pro Search, LLC v. VFM Leonardo, Inc.*,
   2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ...............................................................14

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ........................................................................................................19

*In re Qualcomm Antitrust Litig.*,
  2023 WL 121983 (N.D. Cal. Jan. 6, 2023) .................................................................9

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................................1, 9

*U.S. v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ................................................................................2

*Ryko Mfg. Co. v. Eden Services*,
  823 F.2d 1215 (8th Cir.1987) ...............................................................................16

*Simon and Simon, PC v. Align Tech. Inc.*,
  533 F. Supp. 3d 904 (N.D. Cal. 2021) ...................................................................12

*SPX Corp. v. Mastercool U.S.A., Inc.*,
  2011 WL 2532889 (N.D. Ohio June 24, 2011) ........................................................14

*Terlato Wine Group, Ltd. v. FDIC*,
  2022 WL 17253892 (N.D. Cal. Nov. 28, 2022) ........................................................2

*Thompson Everett, Inc. v. National Cable Ad., L.P.*,
  850 F. Supp. 470 (1994) .......................................................................................16

*Weisbuch v. Cnty. of Los Angeles*,
  119 F.3d 778 (9th Cir. 1997) ..................................................................................4

*Western Parcel Exp. v. United Parcel Service of Am., Inc.*,
  190 F.3d 974 (9th Cir. 1999) .......................................................................2, 12, 16

*Westman Co. v. Hobart Intern. Inc.*,
  796 F.2d 1216 (10th Cir. 1986) ..............................................................................8

Defendant Faire Wholesale, Inc. ("Faire") moves to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and submits the following Memorandum of Law in support of its motion.

## ISSUES TO BE DECIDED

1.      Are Tundra Inc.'s ("Tundra") antitrust claims subject to dismissal because Tundra has failed to allege facts showing a proper relevant market, taking into account all obvious substitutes?

2.      Is Tundra's antitrust challenge to Faire's alleged exclusive dealing provision subject to dismissal under Ninth Circuit precedent holding that exclusive dealing contracts that may be terminated easily and upon short notice do not foreclose competition?

3.      Are Tundra's tortious interference claims subject to dismissal for failure to allege an independently unlawful act?

## PRELIMINARY STATEMENT

In its February 13, 2024 Order,[1] the Court dismissed Tundra's Complaint under Rule 12(b)(6) for failing adequately to allege a proper relevant market.  Tundra has now come back with an Amended Complaint that purports to address that deficiency by adding allegations supposedly establishing a relevant market for "Online Wholesale Marketplaces."  It also has tossed in a number of spurious allegations about alleged Faire price increases and supposed customer dissatisfaction.  These attempts fail to save the Amended Complaint, because Tundra has done nothing to substantively address the fatal defects recognized by this Court in granting Faire's original motion to dismiss.  Tundra has dressed up, but not resolved, the dispositive problems with its market definition and remains unable to establish anticompetitive conduct (here, the alleged foreclosure), an essential ingredient of any antitrust case.

The core problem in Tundra's case remains exactly as before.  As the Court correctly pointed out, "[a] threshold step in any antitrust case is to accurately define the relevant market." Order at 1, quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2285, (2018)).  As discussed below,

---

[1] ECF 71 ("Order").

1   Tundra's Amended Complaint simply repackages the market definition offered in its original

2   Complaint, and fails to cure the vagueness that required dismissal of its original Complaint.

3   Order at 2.

4           In addition, Tundra continues to falsely describe the exclusivity provision in

5   Faire's Terms of Service as binding customers to Faire "for all time" and "forever" (Am. Cplt. ¶¶

6   31, 50).  That is simply not so.  Far from locking Brands or Retailers into perpetual exclusivity,

7   Faire's actual Terms of Service[2] permit Brands to terminate their Faire accounts **at any time, for**

8   **any reason, and with immediate effect.**  Brands and Retailers are *never* locked into using

9   Faire—they can always list on multiple services and can decide to switch away from one or the

10  other at any time.  Under controlling Ninth Circuit law and voluminous precedent both within

11  and outside this Circuit, where an exclusive dealing agreement is easily terminable upon short

12  notice, there cannot be market foreclosure or harm to competition as a matter of law.  *Allied*

13  *Orthopedic Appliances, Inc. v. Tyco Health Care Group, Inc.*, 592 F.3d 991, 997 (9th Cir. 2010);

14  *Western Parcel Exp.* v. *United Parcel Service of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999);

15  *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997).  Courts

16  routinely grant motions to dismiss challenging exclusive dealing provisions that are easily

17  terminable at will, and the same should apply here.

18          Tundra attempts to distract from the infirmity of its exclusive dealing challenge

19  by purporting to raise other allegedly anticompetitive conduct, but the "other" conduct adds

20  nothing to its deficient Complaint.  Faire's "Entire Catalog" policy, which requires Brands to list

21  all of their products for sale on Faire, is just another aspect of exclusivity and fails for the same

22

23  [2] https://www.faire.com/tos-brand. Since Tundra's complaint cites and relies on Faire's Terms of
    Service, they are incorporated by reference into the Complaint, and the Court may consider them

24  on a Motion to Dismiss. *U.S. v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003); *Coto Settlement v.*
    *Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010); *Terlato Wine Group, Ltd. v. FDIC*, 2022 WL

25  17253892, at *4 n.4 (N.D. Cal. Nov. 28, 2022). Further, the Court need not accept Tundra's
    characterizations of Faire's Terms of Service, but should refer to the document itself. *See*

26  *generally Lazy Y. Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). In response to
    Faire's Motion to Dismiss the original Complaint, Tundra faulted Faire for not attaching its

27  Terms of Service to its Motion. Although that is in no way required by the case law, in an
    abundance of caution Faire attaches the Terms of Service that are publicly available on its

28  website to this Motion as Exhibit A.

reasons as Tundra's principal challenge: customers are free to terminate their relationship with Faire at will. Tundra's muddle of additional allegations involving "penalties" for termination and the "targeting" of Tundra are similarly refuted by Faire's actual Terms of Service, derivative of the exclusive dealing challenge, and/or entirely conclusory and ill-pled.

Finally, Tundra's tortious interference claims under California law fare no better. The alleged "interference" consists of Faire supposedly informing customers that they were in breach of their contractual obligations to Faire. Tundra does not allege that the customers were *not* in breach of their contractual obligations to Faire, only that those contracts should be held illegal on antitrust grounds. The tortious interference claim thus fails for the same reason as the antitrust claims.

## STATEMENT OF FACTS

Because the Court is already familiar with Tundra's allegations and they have not materially changed from the original Complaint, Faire will provide just a short summary here.

Faire and Tundra are former competitors in the supposed market for "online wholesale marketplaces" that connect "independent retailers and brands." Am. Cplt. ¶ 2. Faire was founded in 2017. It operates on "a commission-based business model," and allegedly charges higher commissions—up to 25%. Am. Cplt. ¶ 45. Nonetheless, the Complaint acknowledges that Faire often waives commissions entirely. Am. Cplt. ¶ 55.

Tundra characterizes itself as a former white knight competitor that did not charge Brands or Retailers any commissions, but instead relied on "platform-based advertising to generate revenue." Am. Cplt. ¶ 26. Tundra admits that there are other competitors in the market, but asserts some of them have been "forced to exit the market." Am. Cplt. ¶ 29. Tundra further alleges that, since the filing of the original Complaint, it also has exited the market. Am. Cplt. ¶ 65.

Tundra alleges that Faire is monopolizing, attempting to monopolize, and restraining trade in the supposed relevant market. The crux of Tundra's Complaint is a single clause in Faire's Terms of Service with Brands, which, according to Tundra's mischaracterization, allegedly provides that "once a Brand completes any order with a Retailer

1    on Faire's marketplace, the Brand is contractually prohibited from doing business with the

2    Retailer 'in any manner' other than on Faire."  Am. Cplt. ¶ 49.  Tundra further mischaracterizes

3    this provision as a perpetual ratchet that locks Brands and Retailers exclusively into Faire's

4    platform "for all time."  Am. Cplt. ¶ 50.  As discussed below, this assertion is simply false: the

5    Terms of Service make crystal clear that a Brand may terminate its Faire account at any time and

6    for any reason, and transact with Retailers in any way it prefers.

7            In addition to its principal exclusive dealing claim, Tundra alleges a litany of

8    supposedly anticompetitive or tortious behaviors, all essentially derivative of the exclusive

9    dealing claim.  It alleges that Faire requires Brands to list their entire catalogs on Faire, Am.

10    Cplt. ¶ 54; that it uses commission waivers and withholding of payments to enforce the

11    exclusivity provision, Am. Cplt. ¶¶ 55–56; that it "targets Tundra Brands," Am. Cplt. ¶¶ 61–62;

12    and that it "attack[ed]" Tundra's new Wholesale Co-op Platform in a variety of vaguely alleged

13    ways.  Am. Cplt. ¶¶ 63–65.  As discussed below, none of these vague allegations comes close to

14    stating a cause of action.

15                                  **LEGAL STANDARD**

16            "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a

17    cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v.*

18    *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule

19    12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on

20    its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

21    when a plaintiff pleads "factual content that allows the court to draw the reasonable inference

22    that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

23    (2009).  Courts need not "accept as true allegations that are merely conclusory, unwarranted

24    deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049,

25    1055 (9th Cir. 2008).  And even where facts are accepted as true on the pleadings, "a plaintiff

26    may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on

27    his ... claim."  *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir.

28    1997) (quotation marks and citation omitted).

1

**ARGUMENT**

2

**I.   TUNDRA HAS AGAIN FAILED TO ALLEGE A PLAUSIBLE RELEVANT PRODUCT MARKET, WITHOUT WHICH ALL OF ITS ANTITRUST CLAIMS FAIL**

3

4          In its Amended Complaint, Tundra attempts to reframe its defective market

5   definition by referring to the alleged market as the "U.S. Market for Online Wholesale

6   Marketplaces."  Am. Cplt. ¶2.  But upon further inspection, Tundra's definition of the term has

7   not substantively changed.  As the Court held in its February 13, 2024 Order, "[a] threshold step

8   in any antitrust case is to accurately define the relevant market, which refers to 'the area of

9   effective competition.'" Order at 1 (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir.

10   2020) (quoting *Ohio v. Am. Express Co.* ("Amex"), 138 S. Ct. 2274, 2285, (2018)).  A plaintiff's

11   failure to properly define a relevant market requires dismissal under Rule 12(b)(6).  Order at 1

12   (citing *Hicks v. PGA Tour*, Inc., 897 F.3d 1109, 1120 (9th Cir. 2018); *Newcal Indus., Inc. v. Ikon*

13   *Office Sol.*, 513 F.3d 1038, 1044–45 (9th Cir. 2008)).

14          In the original Complaint, Tundra defined a relevant market in "online wholesale

15   marketplaces that connect local retailers throughout the United States with new or emerging

16   domestic brands."  Compl. ¶ 42.  The Court found Tundra's allegations defective because Tundra

17   "fails to define terms like 'local,' 'new,' or 'emerging,' adjectives that facially pare down the

18   relevant market to attribute a greater share to Faire."  Order at 2.  The Court observed that "[t]his

19   proposed market definition appears 'not natural,' 'artificial,' and 'contorted to meet [Tundra's]

20   litigation needs.'" Order at 2 (citing *Hicks*, 897 F.3d at 1121).  In light of Tundra's apparent

21   concession that its proposed market definition was deficient and its stated desire to define an

22   alternative market, the Court dismissed the Complaint, but allowed Tundra a chance to replead.

23   Order at 2.

24          Tundra's Amended Complaint purports to address the deficiency of its original

25   Complaint by defining an "Online Wholesale Marketplace Market."  Am. Cplt. ¶ 67.  Notably,

26   this is the exact same definition Tundra originally tried to pass off, except that Tundra now drops

27   the concepts of "local" retailers and "emerging" brands, which the Court noted it had failed to

28   define.  Tundra's attempted solution to the deficiency of its relevant market definition is thus to

1   simply eliminate two troublesome adjectives rather than to formulate a substantively plausible

2   relevant market.

3            Tundra's effort at repleading creates more problems than it solves.  First, although

4   Tundra has axed "local" and "emerging" as adjectives describing the relevant Retailers and

5   Brands, it has quietly substituted in the word "independent"—again, without providing any

6   definition.  Throughout the Amended Complaint, Tundra repeatedly refers to the retailers and

7   brands who cater to "online wholesale marketplaces" as "independent."  Am. Cplt. ¶¶ 2, 3, 5, 6,

8   8, 11, 12, 15, 17, 25, 68.  The reason for this is clear.  Tundra is well aware that there are many

9   other online platforms that facilitate wholesale transactions, including behemoths like Amazon

10  and Alibaba, that it needs to exclude from the market in order to jack up Faire's market share.

11  For example, the website Shopify provides a list of the "15 best wholesale marketplaces to list

12  your products,"[3] a list that includes Alibaba and many other companies that Tundra does not

13  mention in the Amended Complaint.  In Faire's original Motion to Dismiss, Faire cited the

14  example of Amazon Wholesale,[4] which literally meets every criterion in Tundra's abbreviated

15  market definition: It is "online," limited to "wholesale," and a "marketplace" connecting buyers

16  and sellers.  In its responsive brief to Faire's motion to dismiss the original Complaint, Tundra

17  rejoined that "Amazon's platform appears to largely feature wholesale industrial supplies for

18  businesses such as restaurant, janitorial or breakroom supplies. This is a far cry from the

19  'specialty foods, candles and soaps, and home decorations and furnishings' that Retailers turning

20  to Tundra or Faire seek."  Tundra Opp. at 21.  In other words, Tundra's answer was that other

21  online wholesale marketplaces like Amazon and Alibaba should be excluded from its proposed

22  relevant market because they did not service the right kinds of Retailers and Brands—*i.e.*,

23  "local" and "emerging" ones.

24

25

---

26  [3] https://www.shopify.com/blog/wholesale-marketplace.
    [4] https://business.amazon.com/en/find-solutions/simplify-
27  buying/selection/wholesale?ref=pd_sl_aplus_Brand_Vertical_300984983945_avt_large&ef_id=
    Cj0KCQjwhtWvBhD9ARIsAOP0GogH6pCtFGHFJspLTHtNzKJRzZy7usLPp6SPm2etHB2gsL
28  E2y38uCdgaAqdTEALw_wcB:G:s&s_kwcid=AL!9012!3!533138599433!e!!g!!amazon%20wh
    olesale!13869389889!127700095874.

1        By eliminating the reference to "local" and "emerging" brands from its proposed

2  market definition, Tundra has tried to solve one problem (vague pleading with undefined terms)

3  but created another one: It cannot plausibly maintain that Faire has anything like a monopoly

4  over all "online wholesale marketplaces." So after defining the market in that (clearly

5  unworkable) way, it attempts to implicitly narrow its own definition by constantly referring to

6  the companies that transact on the "online wholesale marketplaces" Tundra has in mind as

7  "independent." But it never defines "independent," nor explains how to distinguish those

8  customers from the thousands of other businesses who also transact on online wholesale

9  marketplaces. Substantively, then, the Amended Complaint is no different from the original

10  Complaint. Tundra's market definition can only work if it is limited to a certain subset of

11  customers who transact on online wholesale marketplaces, and Tundra has still failed to provide

12  any adequate definition of that subset.

13        A second problem with Tundra's market definition is that it fails to explain why

14  other forms of wholesale transacting are not reasonable substitutes for online wholesale

15  platforms. *See Coalition for ICANN Transparency v. VeriSign, Inc.*, 611 F.3d 495, 507 (9th Cir.

16  2010) (market definition turns on reasonable substitutability from perspective of consumer).

17  Tundra admits that online wholesale marketplaces are an "alternative to traditional in-person

18  trade shows," Am. Cplt. ¶ 3, and that brands and retailers substituted to online platforms from

19  those traditional channels during the COVID-19 pandemic. Am. Cplt. ¶ 4. In other words,

20  according to Tundra's own allegations, customers viewed online platforms as substitutes for

21  trade shows. If online platforms are substitutes for trade shows, then trade shows are conversely

22  substitutes for online platforms.

23        Tundra also admits that hiring sales representatives can substitute for transacting

24  online. Am. Cplt. ¶ 2. This is also made clear in Faire's Brands Terms of Service, which allows

25  Brands to designate geographic areas in which their sales teams operate so that Faire can block

26  them off to ensure that the Brand does not "receive orders from those geographical areas." Ex. A

27  at Section 3(b). If Brands did not view ordering through Faire as a substitute for the work of its

28  field reps, there would be no need for such a provision.

Tundra attempts to exclude trade shows, sales representatives, and other means of wholesale exchange by asserting that online platforms are a "superior alternative." Am. Cplt. ¶ 3. But just because some users may find one alternative superior to another does not establish that the alternatives do not compete with each other or that they belong in different relevant markets. The fact that one means of competing is an "effective or even superior way to compete does not mean that the relevant market is limited to those who use that method of competition." *Westman Co. v. Hobart Intern. Inc.,* 796 F.2d 1216, 1220–21 (10th Cir. 1986); see also *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir.1979) ("[P]rice differential alone does not govern the scope of the relevant market."). Rather, the question is whether consumers view two alternatives as reasonable substitutes, such that they would consider switching to the second in response to a price increase in the first, an economic principle known as cross-elasticity of demand. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) ("The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services.") (citation omitted). Tundra makes no allegations concerning the cross-elasticity of demand between online wholesale platforms and other ways that Brands and Retailers choose to transact with each other. Its failure to make such allegations is fatal to its market definition. *MLW Media LLC v. World Wrestling Entertainment, Inc.*, 655 F. Supp. 3d 946, 950 (N.D. Cal. 2023) (("[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, ... the relevant market is legally insufficient.") (citation omitted).

Tundra's Amended Complaint does not solve the deficiency of its market definition, which remains "not natural," "artificial," and "contorted to meet [Tundra's] litigation needs." Order at 2.

## II.     TUNDRA FAILS TO ALLEGE FACTS EVIDENCING AN ANTICOMPETITIVE TERM IN FAIRE'S TERMS OF SERVICE

### A.     Tundra's Exclusive Dealing Claims Require Proof of Substantial Foreclosure of the Relevant Market

Tundra asserts antitrust claims for monopolization and attempted monopolization in violation of Section 2 of the Sherman Act (Counts 1 and 2), an unreasonable restraint of trade

- 8 -

in violation of Section 1 of the Sherman Act (Count 3), and a violation of California's Unfair

Competition Law ("UCL"). Regardless of the statutory section invoked, exclusive dealing is

governed by a rule of reason that requires a plaintiff to allege facts showing that the challenged

restraint harms competition.[5] Because there "are well-recognized economic benefits to exclusive

dealing arrangements, including the enhancement of interbrand competition, an exclusive dealing

arrangement is not per se illegal." *Qualcomm*, 969 F.3d at 1003 (quotation marks and citation

omitted). An exclusive dealing "arrangement violates the Sherman Act under the rule of reason

only if its effect is to 'foreclose competition in a substantial share of the line of commerce

affected.'" *Id*. (citing *Allied Orthopedic*, 592 F.3d at 966).

Further, "exclusive dealing arrangements imposed on distributors rather than end-

users are generally less cause for anticompetitive concern," and a "higher standard of proof of

substantial foreclosure" is required. *Omega Env*., 127 F.3d at 1162–63 (citing *Ryko Mfg. Co. v.

Eden Services*, 823 F.2d 1215, 1235 (8th Cir.1987)) (quotation marks omitted). This is because

"[i]f competitors can reach the ultimate consumers of the product by employing existing or

potential alternative channels of distribution, it is unclear whether such restrictions foreclose

from competition any part of the relevant market." *Id*. This principle is particularly important in

this case, because Tundra alleges that the challenged exclusive dealing provision operates at the

wholesale level rather than on end consumers. Further, Tundra admits that Brands can employ

alternative distribution channels—including direct sales, retail platforms like Amazon, and other

wholesale channels such as trade shows (Am. Cplt. ¶¶ 2, 7, 14) to reach the ultimate consumers

of their products. Although Tundra characterizes these alternative distribution channels as

different or less desirable than online wholesale marketplaces, it does not allege that Faire's

---

[5] Count 4 of the Complaint arises under California's Unfair Competition Law ("UCL"), and fails
for the same reasons as Tundra's federal antitrust claims. California law is clear that "[i]f the
same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice
for the same reason—because it unreasonably restrains competition and harms consumers—the
determination that the conduct is not an unreasonable restraint of trade necessarily implies that
the conduct is not 'unfair' toward consumers." *In re Qualcomm Antitrust Litig.*, 2023 WL
121983, at *20 (N.D. Cal. Jan. 6, 2023) (citations omitted). Further, "conduct alleged to be
'unfair' because it unreasonably restrains competition and harms consumers ... is not 'unfair' if
the conduct is deemed reasonable and condoned under the antitrust laws." *Id.* (citations omitted).
Hence, Tundra's UCL claim fails for the same reason as its federal antitrust claims.

1   policies or practices prevent Brands from selling their products to end consumers.  Thus, the

2   challenged restraints result in no foreclosure at all.  As discussed next, given the short duration

3   and easy terminability of the challenged contracts, there is no foreclosure as a matter of law.

4           **B.      Faire's "No Circumvention" Policy Is Part of a Contract That Is Easily
            Terminable at Will on Short Notice, and Therefore Does Not Foreclose**

5           **Competition as a Matter of Law**

6           The alleged exclusivity provision that Tundra challenges appears in Section 11.e.

7   of Faire's Brand Terms of Service.  Am. Cplt. ¶ 49 n.59.[6] Although Tundra does not attach

8   Faire's Terms of Service to the Amended Complaint, it references them throughout the Amended

9   Complaint and they are publicly available on Faire's website at: https://www.faire.com/tos-

10  brand.

11          Tundra mischaracterizes Faire's "No Circumvention" policy as follows: "once a

12  Brand completes any order with a Retailer on Faire's marketplace, the Brand is contractually

13  prohibited from doing business with the Retailer 'in any manner' other than on Faire—meaning

14  that the Brand cannot transact with the same Retailer on any other competing online wholesale

15  marketplace, and likewise cannot do business with the Retailer offline."  Am. Cplt. ¶ 49.  Tundra

16  asserts that this exclusivity prohibition operates as a permanent one-way ratchet: Brands and

17  Retailers "are prohibited from ever doing business together 'in any manner' offline.  Am. Cplt.

18  ¶ 50.  Elsewhere, it characterizes the "No Circumvention" policy as "an exclusive dealing

19  requirement of indefinite duration Am. Cplt. ¶ 28, that operates "for all time" and "forever."

20  Am. Cplt. ¶ 50.

21          Tundra grossly mischaracterizes Faire's Terms of Service.  The actual No

22  Circumvention clause in Faire's Brands Terms of Service—which Tundra avoids quoting in the

23  Complaint—reads as follows:

24

25

26

27
_____

28  [6] A substantially similar No Circumvention clause appears in the Retailer Terms of Service
    (Paragraph 5(f)), and the same legal standards apply to it. Exhibit B. The same termination
    provision also appears in the Retailer Terms of Service. (Paragraph 14). *Id.*

No Circumvention.  Once an order has been placed through your Shop Page by a Retailer, you agree that you will fulfill all orders placed by such Retailer through the Services.  You further agree to not influence Retailers to transact offline outside of the Services in any manner, or otherwise circumvent Faire's process in order to transact orders with Retailers who were introduced to you through the Services offline or outside of the Services in any manner.  Faire reserves the right to deactivate or terminate your account if you fail to abide by these terms.

Ex. A, Clause 11.e.

Significantly, the Terms of Service also contain a Termination provision (Clause 18).  It provides: "You may terminate your relationship with Faire at any time by contacting us or as otherwise indicated in your Brand Account portal.  Faire will take down your Shop Page as soon as practicable and will close your Brand Account once there has been an accounting of all monies due and owing."

These two clauses work together in the following way: If a Brand creates a Faire account and uses it to match with a Retailer, it agrees to transact with that Retailer through Faire so long as it continues to maintain a Faire account.  However, if it decides to discontinue its Faire account, it is free to transact with that Retailer—or any other Retailer—on any terms or manner it chooses.  In other words, contrary to Tundra's assertion that Retailers and Brands are bound to exclusivity forever once they find each other through Faire, they are simply agreeing to transact through Faire so long as they choose to continue using Faire as a wholesale platform.  They may decide to discontinue their use of Faire at any time, for any reason, and then may transact however they please.[7]  Moreover, there is nothing that Plaintiff can point to in Faire's Terms of

---

[7] Tundra has previously argued that the Terms of Service allowance for free terminability is merely Faire's "interpretation." No, that is just what the Terms of Service plainly say—there is no interpretation involved.  Further, even if the Terms of Service had to be "interpreted," the interpretation of a contract is a question of law that the Court may decide on a motion to dismiss. *U.S. v. Bear*, 439 F.3d 565, 571 (9th Cir. 2006) ("the interpretation of contracts [is] an issue of law"); *KST Data, Inc. v. DCX Tech.*, 2018 WL 5733515, at *5 (C.D. Cal. April 30, 2018) ("The law is clear … that in the absence of ambiguity, contract interpretation is an issue of law for the court, and may be decided on a motion to dismiss."); *see also Obserstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 518 (9th Cir. 2023) (holding that constructive notice of online terms of use was a matter of law to be decided by court). Tundra's allegations about the meaning of the contract that contradicts its actual terms are entitled to no weight. *Lazy Y. Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Service that would stop a Brand or Retailer from selling or buying on Tundra while also doing the same on Faire. The No-Circumvention Policy only applies to Brands and Retailers *first introduced* to one another through Faire, but nothing prohibits a Brand or Retailer from placing a listing on both Tundra (when it was operational) and Faire at the same time. This fact underscores the real purpose of the clause in Faire's Terms of Service—to stop businesses from unfairly and improperly cutting Faire out of transactions that originate on the platform, not to lock brands or retailers into a perpetual exclusivity agreement.

Under such circumstances, there can be no market foreclosure as a matter of law. Controlling law is clear that where an exclusive dealing agreement can be terminated easily and on short notice, the contract does not result in substantial foreclosure of the relevant market. *Allied Orthopedic,* 592 F.3d at 997 ("The 'easy terminability' of an exclusive dealing arrangement 'negate[s] substantially [its] potential to foreclose competition.'") (citation omitted); *Western Parcel*, 190 F.3d at 976 (finding that exclusive contracts did not hinder competition because, among other things, "the challenged contracts had termination provisions that allowed a customer to terminate the contract for any reason with very little notice"); *Omega*, 127 F.3d at 1163-64 (9th Cir. 1997) ("the short duration and easy terminability of these agreements negate substantially their potential to foreclose competition"); *Maxim Integrated Prods., Inc. v. Analog Devices, Inc.*, 1996 WL 117425 (Table), at *2 (9th Cir. Mar. 15, 1996) (holding that alleged exclusive agreements that may be terminated "without penalty ... strongly favor[] a finding of no unreasonable restraint on competition"); *Simon and Simon, PC v. Align Tech. Inc.*, 533 F. Supp. 3d 904, 916 (N.D. Cal. 2021) ("'the short duration and easy terminability of [ ] agreements negate substantially their potential to foreclose competition' because 'a competing manufacturer need only offer a better product or a better deal to get its own contracts'") (citation omitted); *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 903 (N.D. Cal. 2012) (the prevailing view in the 9th Circuit is that exclusive contracts of short duration and terminable at will are not exclusionary); *In re EpiPen Antitrust Litig.*, 44 F.4th 959, 988–89 (10th Cir. 2022) (affirming grant of summary judgment in favor of defendant in exclusive dealing case because the exclusive agreements were short term and easily terminable); *In re Mylan N.V. Secs. Litig.*,

666 F.Supp.3d 266, 292 (S.D.N.Y. March 30, 2023) (holding that exclusive dealing contracts that were of short duration and easily terminable did not violate antitrust laws).

As the Ninth Circuit explained in *Omega*, where a customer is free to terminate its contract with the defendant and sign up with another company, a competitor "need only offer a better product or a better deal to acquire their services." 127 F.3d at 1164. Similarly, as the Tenth Circuit recently explained drawing on Ninth Circuit precedent, "[i]t is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination." *In re EpiPen*, 44 F.4th at 988. Even if the exclusive contract is nominally of relatively lengthy duration, "opportunities for competition remain" if the customer can terminate the contract for any reason upon relatively short notice. *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (affirming grant of summary judgment for defendant where contract's term was three years but could "be cancelled without cause upon six-months' notice"). Similarly, the leading antitrust treatise explains that "[e]ven an exclusive-dealing contract covering a dominant share of a relevant market need have no adverse consequences if the contract is let out for frequent rebidding." 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802g2 (4th ed. 2015). The treatise gives the example of a leading manufacturer's exclusive dealing contract that retailers can cancel on 30 days' notice. In such circumstances, if the dominant manufacturer tries to "use this scheme to exclude rivals and charge high wholesale prices, any store currently selling [the manufacturer's] shoes could in a 30-day period be selling the shoes of [one of the manufacturer's] rival[s]." *Id.*

The same is true here. If Tundra wants to secure a Brand's business, it has simply to convince the Brand that it will do better on Tundra than on Faire. The Brand can then terminate its Faire account and move its business to Tundra. Under such circumstances, Tundra "'need only offer a better product or a better deal' to reverse, and possibly wield, exclusivity." *In re EpiPen*, 44 F.4th at 989 (quoting *Omega*, 127 F.3d at 1164). That is competition, not exclusion.

1           Not only does precedent hold that exclusive contracts that are terminable upon

2 short notice do not violate the antitrust laws, it holds that this issue is appropriately decided on a

3 motion to dismiss.  Where a plaintiff challenges exclusive dealing agreements that are easily

4 terminable upon short notice, courts do not hesitate to grant motions to dismiss those complaints

5 under Rule 12(b)(6).  *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at

6 *22–23 (C.D. Cal. July 24, 2018) (dismissing complaint challenging exclusive dealing

7 agreement because easily terminable contracts do not run afoul of antitrust law); *PNY Tech.,*

8 *Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4 (N.D. Cal. 2014) (dismissing exclusive dealing

9 claims where the "short duration and easy terminability" of the exclusivity commitment "negate

10 substantially their potential to foreclose competition"); *Pro Search, LLC v. VFM Leonardo, Inc.*,

11 2013 WL 6229141, at * 6 (C.D. Cal. Dec. 2, 2013) (reporting that the court had dismissed

12 exclusive dealing claims because the exclusive contracts "are of relatively short duration and,

13 crucially, can be terminated upon short notice"); *SPX Corp. v. Mastercool U.S.A., Inc.*, 2011 WL

14 2532889, at *4 (N.D. Ohio June 24, 2011) (dismissing exclusive dealing claims because "[s]uch

15 short contracts, with no-questions-asked termination clauses, do not approach the threshold of

16 foreclosing competition, even in a substantial share of the market, required for a private antitrust

17 claim").

18           Tundra previously sought to introduce *Applied Med. Res. Corp. v. Medtronic,*

19 *Inc.,* No. 8:23-cv-00268-WLH-DFM, 2023 WL 5503107 (C.D. Cal. Aug. 2, 2023) and a Federal

20 Trade Commission ("FTC") amicus brief cited in that case as supplemental authority for its

21 position in this case.  ECF No. 60.  In *Applied,* the court found that the plaintiff's claims could

22 not be resolved on a motion to dismiss and, in a footnote, observed that the "FTC correctly

23 points out in its amicus brief that there is no rule that a plaintiff must calculate and allege the

24 exact portion of foreclosed sales in an initial complaint."  2023 WL 5503107 at *2 n.1.  That

25 observation has nothing to do with this case, since Faire has not argued that Tundra's Complaint

26 is subject to dismissal for failure to calculate the exact portion of the market foreclosed.  Instead,

27 Faire submits that there is *no foreclosure at all* when an exclusive dealing contract can be easily

28

terminated upon short notice, as the Ninth Circuit held in *Allied*, *Western Parcel*, and *Omega* and the many other opinions cited above hold.

Not to the contrary, the FTC amicus brief purports to explain how short-term exclusive dealing contracts can be problematic when they are not "terminable in practice." The Commission was referring to cases where the short-term terminability of an exclusive contract does not immunize the defendant from antitrust liability because the defendant has undertaken *other anticompetitive acts* to induce customers not to terminate. For example, in *Applied* the defendant employed bundled discounts on top of exclusive contracts. 2023 WL 5503107 at *1. The customers who terminated their exclusive dealing contracts would also lose their discounts and might thus have a strong disincentive to terminate. The anticompetitive bundled discount would bind the customer to exclusivity regardless of the right to terminate. But that has nothing to do with the facts of this case. Tundra has not alleged that Faire has offered customers bundled discounts that they would lose if they terminated their relationship with Faire. Instead, Tundra is challenging straightforward exclusive dealing agreements that are terminable by the customer at any time, for any reason, and with immediate effect. Under controlling Ninth Circuit precedent, those contracts do not foreclose competition. Even if the FTC brief said otherwise (and it does not), it could not alter the law in this Circuit.

Tundra's assertion that Brands and Retailers are forever obligated to transact exclusively through Faire once they make a connection through Faire is simply untrue and contradicted by the very Terms of Service that are the basis of Tundra's Complaint. The commitment to transact through Faire continues only so long as a Brand chooses to continue doing business through Faire. Brands and Retailers are free to pursue a different arrangement at any time, and, indeed, to change their minds and return to Faire if those other arrangements do not work out. There is no market foreclosure as a matter of law.

**C.   Tundra's Challenge to Faire's "Entire Catalog" Policy Adds Nothing to Its Inadequate Exclusive Dealing Allegations**

Faire's "Entire Catalog" provision requires Brands to list all of their products for sale on Faire. Tundra describes this as an "all-or-nothing requirement," and alleges that it

"greatly impedes the ability of rival online wholesale marketplaces to attract the business of Brands that are already on Faire." Am. Cplt. ¶ 54. But what Tundra is describing is simply exclusivity—the very attribute of an exclusive distributorship contract. *See Thompson Everett, Inc. v. National Cable Ad., L.P.*, 850 F. Supp. 470, 476 n.4 (1994) ("[a]n exclusive distributorship typically provides a distributor with the right to be the exclusive outlet for a manufacturer's products or services in a given geographic area") (citing ABA Antitrust Section, *Antitrust Law Developments*, 117 (3d ed. 1992)). An agreement that says "you will distribute your products only through me" is no different from an agreement that says "you will distribute all of your products only through me."

As courts have recognized, exclusivity agreements in a product line can have the procompetitive effect of removing the "free rider" threat to one party's "promotional activity" and ensuring that a company that has made a "marketing investment" will not lose it to other firms. *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 n.17 (8th Cir. 1987). The Ninth Circuit has recognized that "exclusive dealing arrangements provide 'well-recognized economic benefits ... including the enhancement of interbrand competition.'" *Aerotec In'tl, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 n.2 (9th Cir. 2016) (citing *Omega*, 127 F.3d at 1162); *see also Balaklaw*, 14 F.3d at 799 (holding that exclusive dealing contract with short duration "may actually encourage, rather than discourage, competition, because the incumbent and other, competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions"); *Power Analytics Corp.* v. *Operation Technology, Inc.*, 2018 WL 10231437, at * 14 (C.D. Cal. July 24, 2018) ("Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition.") (citation omitted).

Tundra's complaints about Faire's "Entire Catalog" provision add nothing to, and cannot cure the defects of, its allegations concerning the No Circumvention clause: both concern exclusive dealing. Given the easy terminability on short notice of a Brand's contract with Faire, the exclusivity has no anticompetitive effect. *Western Parcel*, 190 F.3d at 976; *Omega*, 127 F.3d at 1163–64.

- 16 -

1

### D.    Tundra's Remaining Allegations of Anticompetitive Conduct Are Ill-Pled and Insufficient to Save Tundra's Antitrust Claims

2

3    In addition to complaining about Faire's No Circumvention and "Entire Catalog"

4    policies, Tundra challenges Faire's enforcement of its licensing terms through waived

5    commissions and refusing to make payments to Brands that violated Faire's terms of use, its

6    "targeting" of Tundra, and its "attacks" on Tundra's Wholesale Co-op platform.  Am. Cplt.

7    ¶¶ 61–65.  These allegations cannot save the deficiency of Tundra's antitrust claims.

8    Tundra's allegations that "Faire uses its listed commissions on Brands" to induce

9    compliance with its contract, Am. Cplt. ¶ 55, adds nothing to Tundra's antitrust complaint.  Price

10   concessions in exchange for customer loyalty are presumptively procompetitive, and are only

11   unlawful when they result in below-cost pricing capable of excluding an equally efficient

12   competitor.  *Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 903 (9th Cir. 2008).

13   Tundra makes no allegations that Faire's commission waivers result in below-cost pricing by

14   Faire, and hence fails to state a claim that the commission waivers are unlawful.  Nor does

15   describing the loss of commission waivers as a "penalty," Am. Cplt. ¶ 55, make the program

16   anticompetitive.  *See Eisai Inc. v. Sanofi-Aventis U.S.*, 2014 WL 1343254, at *4 (D.N.J.

17   March 28, 2014) (holding that, whether described as offering discounts or threatening penalties,

18   sales program that induced customer loyalty did not violate the antitrust laws given that it did not

19   result in below-cost pricing and was terminable by customers for any reason upon 30  days'

20   written notice), *aff'd*, 821 F.3d 394 (3d Cir. 2016).  Further, Tundra's "penalty" allegation

21   directly contradicts the explicit statements on Faire's website: "***There's no penalty for closing***

22   ***or pausing your account***.  Our goal is to offer a delightful and lucrative experience so you'll

23   want to continue partnering with us.  If you'd like to stop selling on Faire, reach out to us

24   through the 'Contact Us' link below and we'll help take down your Faire page."[8] No weight

25   should be placed on allegations that directly contradict the explicit language of the public

26   website on which Tundra's allegations are based.  *Lazy Y. Ranch Ltd. v. Behrens*, 546 F.3d 580,

27

28

---

[8] https://www.faire.com/support/articles/360015893352 (emphasis added), attached hereto as Exhibit C.

588 (9th Cir. 2008) ("we need not accept as true allegations contradicting documents that are referenced in the complaint").

Tundra complains that Faire has at times withheld payments from Brands that have breached the agreed-upon Terms of Service. Am. Cplt. ¶ 56. Tundra's claim is entirely conclusory. It alleges that Faire has withheld payments for "suspected noncompliance" but does not specify the nature of the noncompliance that allegedly triggered the withholding of payments, whether it was for material or immaterial violations of Faire's Terms of Service, and whether it was justified or unjustified under ordinary principles of contract law. At most, this allegation avers that Faire enforces its exclusive dealing agreement, and therefore fails for want of allegations showing that the exclusive dealing agreement violates the antitrust laws.

Tundra's complaint about Faire's supposed "targeting" of Tundra "to further increase its market share" is based on the claim that Faire has informed some Brands that they are in breach of its Terms of Service if they sell to Retailers with whom they connected on Faire. Am. Cplt. ¶¶ 61–62. The note from a Brand that Tundra quotes in the Complaint admits that the Brand was "in violation of [Faire's] vendor policy." Am. Cplt. ¶ 61. So, again, this claim is entirely dependent on the assertion that Faire's vendor policy is anticompetitive which, as discussed above, is unfounded.

Finally, Tundra alleges that Faire "attacked" its new Wholesale Co-op platform ("WSC") by "threaten[ing] businesses that signed up for WSC or were considering joining, employ[ing] highly skilled engineers to thwart WSC's platform and disrupt the business, us[ing] electronic subterfuge to attempt to greatly increase costs for WSC of operating its service, and threaten[ing] crippling legal action if the names of all participating Retailers weren't immediately disclosed." Am. Cplt. ¶ 63. None of these vague and conclusory assertions come close to demonstrating an antitrust violation. Tundra offers no clue as to the nature of Faire's supposed "threat" to businesses considering WSC or its supposed engineering "subterfuges." To the extent that Tundra means to allege that Faire responded to Tundra by redesigning its own technology, that is not an antitrust violation. *Allied Orthopedic*, 5923 F.2d at 998 ("A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete

1    aggressively on the merits, and any success it may achieve solely through 'the process of

2    invention and innovation' is necessarily tolerated by the antitrust laws.") (quoting *Foremost Pro*

3    *Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543 (9th Cir.1983)).  Nor can threatening

4    litigation be the basis of an antitrust claim absent unusual circumstances that Tundra does not

5    allege.  *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49,

6    60–61 (1993) (holding that the assertion of claims in litigation is protected from antitrust

7    challenge unless plaintiff can show that claims were objectively baseless and subjectively

8    intended to interfere directly with a competitor); *see also Primetime 24 Joint Venture v. National*

9    *Broadcasting Co.*, 219 F.3d 92, 100 (2d Cir. 2000) (*Noerr-Pennington* immunity applies to "pre-

10   litigation 'threat letters'").

12   **III.    TUNDRA'S TORTIOUS INTERFERENCE CLAIM DEPENDS ON THE**
         **ILLEGALITY OF FAIRE'S CUSTOMER CONTRACTS, AND SHOULD BE**
13       **DISMISSED FOR THE SAME REASON AS THE ANTITRUST CLAIMS**

14           In its fifth count, Tundra asserts a claim for intentional interference with Tundra's

15   contractual relations with third-party Brands.  Am. Cplt. ¶¶ 116–22.  Tundra does not allege that

16   Faire did anything to cause customers to breach their contracts with Tundra.  Rather, it seems to

17   allege that Faire has informed some unspecified number of Brands that have existing agreements

18   with Tundra and also with Faire that they are in breach of their contract with Faire by selling on

19   Tundra to retailers with whom they have matched on Faire.  Tundra does not allege that any such

20   statement by Faire was false.  Instead, the claim seems to be that Faire induced customers to stop

21   doing business with Tundra by correctly telling them that doing so was in breach of their contract

22   with Faire.

23           Under California law, "to state a claim for interference with an at-will contract by

24   a third party, the plaintiff must allege that the defendant engaged in an independently wrongful

25   act."  *Ixchel Pharma, LLC* v. *Biogen, Inc*., 9 Cal.5th 1130, 1148 (2020).  Since Faire is not

26   alleged to have induced any customer to breach a contract with Tundra, and also is not alleged to

27   have misrepresented the customers' own contractual obligations to Faire, the only possible

28   "independently wrongful act" would be enforcement of an anticompetitive contract.  This claim

- 19 -

thus bootstraps and is entirely dependent on Tundra's antitrust claims.  Because Tundra is unable

to show an antitrust violation for the reasons discussed above, its tortious interference claim fails

as well.  *Ahn v. Stewart Title Guaranty Co.*, 93 Cal. App. 5th 168, 178 (Cal. 4th Dist. Ct. App.

2023) ("Our conclusion that Ahn cannot state an antitrust claim prevents him from

demonstrating a triable issue as to either of his derivative business tort claims, which require

proof of an independently wrongful act.").

## CONCLUSION

For all of the foregoing reasons, Faire respectfully requests that Tundra's

Amended Complaint be dismissed with prejudice.


Dated:  June 14, 2024                                 PAUL, WEISS, RIFKIND, WHARTON &
                                                                       GARRISON LLP


                                                           By:   */s/ Katherine B. Forrest*
                                                                       Katherine B. Forrest
                                                                       kforrest@paulweiss.com
                                                                       Matthew A. Robinson
                                                                       mrobinson@paulweiss.com
                                                                       1285 Avenue of the Americas
                                                                       New York, NY  10019-6064
                                                                       Telephone: (212) 373-3000
                                                                       Facsimile: (212) 757-3990

                                                                       *Attorneys for Defendant*
                                                                       FAIRE WHOLESALE, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2024, I electronically transmitted the foregoing **DEFENDANT FAIRE WHOLESALE, INC.'S MOTION TO DISMISS PLAINTIFF TUNDRA INC.'S AMENDED COMPLAINT FOR (1) VIOLATIONS OF THE SHERMAN ACT, (2) VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, AND (3) TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, THE DECLARATION OF KATHERINE B. FORREST IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, AND THE [PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT** to the Clerk's Office using the CM/ECF System for filing, thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ Katherine B. Forrest*_____